IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEREMY MARTIN HAAR, | : | Civil No. 1:23-CV-00041 |
| Plaintiff, | : | |
| v. | : | |
| JESSICA SAGE, *et al.*, | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court is Defendants' motion to dismiss the amended complaint and, in the alternative, a motion for summary judgment. (Doc. 50.) Because no *Bivens* remedy is available, the amended complaint will be dismissed with prejudice and the case will be closed.

### BACKGROUND AND PROCEDURAL HISTORY

On January 10, 2023, the court received and docketed a complaint filed by Jeremy Martin Haar ("Plaintiff"). (Doc. 1.) On January 25, 2023, the court received and docketed a motion to amend the complaint. (Doc. 9.) This motion was denied on February 7, 2023 because Plaintiff was within the period to amend as a matter of course pursuant to Federal Rule of Civil Procedure 15 and Plaintiff was granted a period of thirty days to amend his complaint before screening and service would be completed. (Doc. 12, pp. 6–7.) Because Plaintiff did not file an amended complaint in the allotted time, the court screened the complaint,

1

dismissed some claims as improperly joined and forwarded a copy of the complaint and waiver of service forms to four of the named Defendants on April 3, 2023. (Doc. 22.) Plaintiff filed another motion to amend the complaint on April 19, 2023, which was promptly denied because it was within the time period to amend the complaint as a matter of course under Federal Rule of Civil Procedure 15. (Docs. 26, 28.)

In June, Defendants filed a motion to dismiss the complaint and, in the alternative, a motion for summary judgment. (Doc. 29.) In August of 2023, Plaintiff filed a motion to amend the complaint with a proposed amended pleading. (Docs. 40, 41.) On August 31, 2023, the court granted Plaintiff's motion to amend the complaint, docketed the amended complaint, screened the complaint, and dismissed the Defendants' motion to dismiss as moot. (Doc. 44.)

On October 30, 2023, Defendants filed the instant motion to dismiss and, in the alternative, motion for summary judgment. (Doc. 50.) Defendants filed a brief in support and statement of facts on November 13, 2023. (Docs. 54, 55.) Plaintiff filed a brief in opposition, statement of disputed factual issues, and an affidavit in opposition on December 11, 2023. (Docs. 60, 61, 62.) On January 26, 2024, Defendants filed a reply brief. (Doc. 65.) On February 26, 2024, Plaintiff filed an answer to the statement of facts. (Doc. 67.) The court will now address the pending motion to dismiss.

## JURISDICTION AND VENUE

The court has jurisdiction over Plaintiff's action pursuant to 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States. Venue is proper in this district because the alleged acts and omissions giving rise to the claims occurred at the Federal Correctional Institution Schuylkill ("FCI-Schuylkill"), located in Schuylkill County, Pennsylvania, which is located within this district. *See* 28 U.S.C. § 118(b); (Doc. 45, p. 1).

## MOTION TO DISMISS STANDARD

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to survive a motion to dismiss. *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79). To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than

conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) *abrogated on other grounds by Mack v. Yost*, 968 F.3d 311 (3d. Cir. 2020).

When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents" attached to a defendant's motion to dismiss if the plaintiff's claims are based upon these documents. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

The pleadings of self-represented plaintiffs are to be liberally construed and held to a less stringent standard than formal pleadings drafted by attorneys.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Fantone v. Latini*, 780 F.3d 184, 193 (3d Cir. 2015), as amended (Mar. 24, 2015).  Self-represented litigants are to be

granted leave to file a curative amended complaint even when a plaintiff does not seek leave to amend, unless such an amendment would be inequitable or futile. *See Est. of Lagano v. Bergen Cnty. Prosecutor's Off.*, 769 F.3d 850, 861 (3d Cir. 2014); *see also Phillips*, 515 F.3d at 245. A complaint that sets forth facts which affirmatively demonstrate that the plaintiff has no right to recover is properly dismissed without leave to amend. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 106 (3d Cir. 2002).

## DISCUSSION

### A. Summary of Amended Complaint

In the amended complaint, Plaintiff names the following seven Defendants: (1) Jessica Sage ("Sage"), Warden at FCI-Schuylkill at the time of the alleged events; (2) Richard Andreuzzi ("Andreuzzi"), physician assistant employed at FCI-Schuylkill; (3) Bret Brosious ("Brosious"), the Health Service Administrator ("HSA") at FCI-Schuylkill; (4) Greg George ("George"), Assistant HSA at FCI-Schuylkill; (5) Julie Frith ("Frith"), the Assistant Warden at FCI-Schuylkill; (6) J. Meneke ("Meneke"), Chief Psychologist at FCI-Schuylkill; and (7) J. Dunlop ("Dunlop"), a physician at FCI-Schuylkill. (Doc. 45, p. 1.)

Plaintiff alleges that on August 29, 2022, he arrived at Schuylkill in Minersville, Pennsylvania. (*Id.*, p. 1.) Plaintiff states that he informed medical staff conducting the health screen that he suffered from "extremely painful chronic

migraines," that his current prescribed treatment was not helping, that the was supposed to be sent for a neurological consult and a CT scan, and that he requested to be provided with a new migraine treatment. (*Id*., pp. 1–2.) Plaintiff states that he was told that nothing could be done at that moment, and he should go to the health services the next day and submit a sick call. (*Id*., p. 2.)

Plaintiff alleges that on August 30, 2022, he reported to the health services and submitted a paper sick call stating that he was in severe pain as a result of the untreated migraines and requested a "functional migraine reliever" and to be sent for the neurological consultation and CT scan that had been previously prescribed by Dr. Grade Melendez. (*Id*.) The medical staff accepted his sick call and stated that he would be seen within one week. (*Id*.)

Plaintiff alleges that on September 7, 2022, he returned to health services to see if he had been scheduled, and was told that he was not scheduled. (*Id*.) Plaintiff then filed another sick call stating the same as that filed on August 30, 2022. (*Id*.)

On September 13, 2022, Plaintiff was placed on a medical call out to health services, and saw Defendant Dunlop. (*Id*.) Plaintiff alleges that he asked Defendant Dunlop if this was in response to his sick call requests and Defendant Dunlop stated that it was not. (*Id*.) Instead, it was Plaintiff's 14-day physical for chronic care inmates. (*Id*.) Plaintiff alleges that he informed Defendant Dunlop

about his severe chronic migraines and the previously ordered neurological evaluation and CT scan. (*Id.*) He also alleges that he told Defendant Dunlop that his current migraine medications were not working and he asked for a new medication for the migraines. (*Id.*) Plaintiff alleges that Defendant Dunlop refused to provide any type of treatment and told Plaintiff to deal with the pain and take Tylenol. (*Id.*) Plaintiff alleges that Defendant told him that if he was in so much pain to file another sick call, which Plaintiff alleges he did. (*Id.*)

Plaintiff alleges that over a week later, Plaintiff had still not been seen by health services and he filed a sick call request through health services on paper and on the "BOP TRULINC". (*Id.*) Plaintiff states that over "the next several weeks" he submitted "countless sick calls to medical" requesting treatment and spoke with medical staff during "main line" requesting treatment. (*Id.*) Plaintiff states that the only response to his sick call requests was to follow the treatment plan provided on September 13, 2022. (*Id.*)

Plaintiff alleges that on November 25, 2022, Plaintiff was seen for a sick call while housed in "SHU." (*Id.*) Plaintiff was seen by Defendant Andreuzzi, "who was informed by the plaintiff that he had suffered a head injury in the end of 2020 while being held in Essex County Jail, and that as a result of the injury he had been diagnosed with vestibulopothy [sic] as well as chronic migraines and was prescribed Topomax." (*Id.*) He also allegedly informed Defendant Andreuzzi that

7

an examination by a neurologist and a CT scan had been ordered, but had not been completed. (*Id*., p. 3.) Plaintiff alleges that Defendant Andreuzzi stated that a neurologist and CT scan "was incredibly necessary" because "it was incredibly abnormal and worrysome [sic] that plaintiff was still showing symptoms over a year after the injury." (*Id*.) Plaintiff informed Defendant Andreuzzi that he was being transferred to another facility, and Defendant Andreuzzi stated that because of the pending transfer, he would not put Plaintiff in to see the neurologist or for a CT scan because there was a nine to twelve month wait list to be seen for outside care. (*Id*.) Plaintiff alleges that he repeated that he was in extreme pain and suffering and needed treatment and Defendant Andreuzzi continued to refuse "stating that he could not justify sending plaintiff to the hospital." (*Id*.) Plaintiff then requested to be re-prescribed Topomax as he had experienced positive results with the medication previously. (*Id*.) Defendant Andreuzzi said that "he would speak to the pharmacist about submitting a non-formulary request for Topomax. (*Id*.)

    Plaintiff alleges that on November 28, 2022, Defendant Andreuzzi came to his cell and informed him that the pharmacist would not submit the non-formulary request for Topomax and the only available treatment was Depakote, which was not a migraine treatment but could potentially be used to treat migraines. (*Id*.) Plaintiff alleges that he asked Defendant Andreuzzi if he had ever heard of it being

successful in the treatment of migraines and Defendant Andreuzzi said no, but that it had been recommended by the pharmacist. (*Id.*) Plaintiff agreed to try Depakote on the condition that, if it did not work, he would be prescribed a different treatment. (*Id.*) Defendant agreed that if it did not work, Plaintiff could submit a sick call stating that it was not helping and they would look at other treatment options. (*Id.*)

Plaintiff alleges that he began takin Depakote daily on December 2, 2022, and tried it for several weeks. (*Id.*) Plaintiff alleges that it provided "zero relief" from the pain and he "was left in debilitating pain effecting his daily function." (*Id.*) Plaintiff alleges that he immediately began submitting sick call requests stating that his current medication was not working. (*Id.*)

Plaintiff alleges that on or about December 20, 2022, he spoke to Defendants Sage, Frith, and Brosious during SHU rounds and informed them that he was being refused adequate and proper medical attention, that his sick call slips were being ignored, and that as a result he was left in severe pain. (*Id.*, p. 4.) He repeated to them that previously outside treatment had been ordered and the medical staff at FCI-Schuylkill had refused to submit the order due to the long wait list and Plaintiff's pending transfer. (*Id.*)

Plaintiff alleges that over the next several weeks, he informed Defendants Sage, Frith, Brosious, and George that he was being denied care despite several

9

sick calls being submitted to medical staff. (*Id.*) He was told that medical had been short staffed and that other inmates had more important medical needs. (*Id.*) Plaintiff alleges that he continued to tell administrative staff and Defendants Andreuzzi and Meneke of his severe pain and the denial of care. (*Id.*)

On January 27, 2023, Plaintiff refused his Depakote stating that it did not work and he wanted new treatment. (*Id.*) Plaintiff signed a refusal form. (*Id.*) Plaintiff alleges that in the following weeks he continued to request to be seen by medical staff and submitted "countless" sick calls and these requests were denied or ignored. (*Id.*)

Plaintiff alleges that on January 10, 2023, during psychological SHU rounds, he spoke with Defendant Meneke and told him that he was depressed and wanted to be re-prescribed his mental health medications. (*Id.*) Defendant Meneke stated that he could not place Plaintiff back on his medications, but that he would send an email to health services and inform them of Plaintiff's request. (*Id.*) Plaintiff told Defendant Meneke that he had been trying to get treatment for weeks and he would have to send an email expressing the urgency and emphasizing the need for medical to see Plaintiff. (*Id.*) Plaintiff states that the next week when Defendant was making the SHU rounds, Plaintiff repeated the need for mental health treatment and Defendant told him that he had sent the email and there was nothing else he could do. (*Id.*) Over the next several weeks, Plaintiff continued to report

his need for mental health treatment to Defendant Meneke and Defendant Meneke said there was nothing he could do to force health services to see Plaintiff. (*Id.*)

Plaintiff sues Defendants Sage, Andreuzzi, Brosious, George, Frith, Meneke, and Dunlop in their individual capacity. (Doc. 45, p. 1.) He brings Eighth Amendment claims against all Defendants. (*Id.*, p. 5.)

In screening, the court previously dismissed the Eighth Amendment claim against Defendant Meneke as not stemming from the same transaction or occurrence. (Doc. 44.)

### B. The Court Will Dismiss Plaintiff's *Bivens* Claims.

Before the court is Plaintiff's amended complaint suing seven defendants for cruel and unusual punishment under *Bivens*. (Doc. 45.) "*Bivens* is the short-hand name given to causes of action against federal officials for alleged constitutional violations." *Bistrian*, 912 F.3d at 88. In the case giving the doctrine its name, the Supreme Court held there is a cause of action for damages when a federal agent, acting under color of his authority, conducts an unreasonable search and seizure in violation of the Fourth Amendment. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971). The Supreme Court subsequently extended *Bivens* to allow claims under the Fifth Amendment's due process clause for gender discrimination in the employment context, *Davis v. Passman*, 442 U.S. 228, 248–49 (1979), and under the Eighth Amendment's

prohibition of cruel and unusual punishment clause in the prison medical care context, *Carlson v. Green*, 446 U.S. 14, 23–25 (1980). The Supreme Court also established a standard to determine whether a *Bivens* cause of action should be further recognized in a new context. *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

The *Abbasi* decision invoked by Defendants sets forth a two-part test for determining whether a prospective *Bivens* claim may proceed. First, courts must ascertain whether the case presents a "new context." *Ziglar v. Abbasi*, 582 U.S. 120, 139 (2017). If the case differs "in a meaningful way from previous *Bivens* cases decided by th[e Supreme] Court, then the context is new." *Abbasi*, 582 U.S. at 139. And the meaning of "new context" is "broad." *See Hernandez v. Mesa*, 589 U.S. 93, 102 (2020). Second, if the case presents a new context, the court must then consider whether "special factors" counsel against extending the *Bivens* remedy. *See Abbasi*, 582 U.S. at 139–40. This inquiry asks whether "the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (quoting *Abbasi*, 582 U.S. at 136). If a court concludes that "even a single reason" exists to pause "before applying *Bivens* in a new context or to a new class of defendants," then special factors counseling hesitation exist and a *Bivens* remedy does not lie. *See Egbert*, 596 U.S. at 492 (quoting *Hernandez*, 589 U.S. at 102) (internal quotation marks omitted).

The Supreme Court's decision in *Egbert* reemphasized that the Court's continued refusal to "imply a similar cause of action for other alleged constitutional violations" is intentional—recognizing a new *Bivens* cause of action is "a disfavored judicial activity." *See Egbert*, 596 U.S. at 483, 491 (quoting *Abbasi*, 582 U.S. at 136; *Hernandez*, 589 U.S. at 101-03). *Egbert* clarified that the two-step process laid out in *Abbasi* "often resolve[s] to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *See Egbert*, 596 U.S. at 492. In other words: if there is "any rational reason (even one) to think that Congress is better suited" to determine the propriety of a cause of action, then a *Bivens* action cannot proceed. *See Egbert*, 596 U.S. at 496. The court must broadly inquire whether "there is any reason to think that 'judicial intrusion' into a given field might be 'harmful' or 'inappropriate'"—and if the answer is "yes," or even potentially yes, the plaintiff cannot recover under *Bivens*. *See Egbert*, 596 U.S. at 496 (quoting *United States v. Stanley*, 483 U.S. 669, 681 (1987)).

The court proceeds with *Abbasi*'s two-step analysis. Plaintiff's deliberate indifference claims fall under the Eighth Amendment. Of the three cases in which the Supreme Court has recognized *Bivens* claims, only *Carlson*—involving an Eighth Amendment claim—is relevant. In *Carlson*, a prisoner's estate filed suit alleging that prison officials had been fully aware of the prisoner's serious

13

"chronic asthmatic condition" as well as the "gross inadequacy" of medical facilities and prison staff.  *See Carlson*, 446 U.S. at 16 n.1.  The estate alleged officials failed to provide the prisoner "competent medical attention for some eight hours after he had an asthmatic attack," including an inordinate delay of his transfer to an outside hospital, all of which led to the prisoner's death.  *See Carlson*, 446 U.S. at 16 n.1.

Here, Plaintiff's Eighth Amendment inadequate medical care claims are markedly different from the Eighth Amendment inadequate medical care claim recognized in *Carlson*.  While the claims arise under the same constitutional amendment, the Supreme Court has made clear that a common constitutional basis is not enough to link a new *Bivens* theory to an existing *Bivens* context.  *See Hernandez*, 589 U.S. at 103 (indicating courts must "look beyond the constitutional provisions invoked").  Plaintiff's Eighth Amendment deliberate indifference claims do not involve a medical emergency, as did *Carlson*, but rather focuses on the long term and ongoing course of medical treatment of Plaintiff's chronic, non-fatal condition for which Plaintiff was provided treatment according to his complaint.  This difference is significant.  Specifically, the administrative and injunctive relief would have a completely different application to Plaintiff's claims than the claims in *Carlson*, where the failure to properly address a medical emergency proved fatal.  *See Egbert*, 142 S. Ct. at 1803 (explaining that "a new

context arises when there are 'potential special factors that previous *Bivens* cases did not consider'" (quoting *Ziglar*, 137 S. Ct. at 1864)).  Thus, these three Eighth Amendment deliberate indifference claims differ meaningfully from *Carlson* and constitute a new context.  *See Peguero v. Quay*, No. 1:22-cv-00057, 2023 WL 2410882 at *8–9 (M.D. Pa. Mar. 8, 2023); *Holton v. Finley*, No. 4:-21-CV-737, 2023 WL 1919238 at *9 (M.D. Pa. Mar. 21, 2024).

Because the court concludes that Plaintiff's Eighth Amendment claims present a new context, the court must turn to the second *Abbasi* step and determine whether any special factors are present.  In this context, the court asks whether "there are any special factors that counsel hesitation" in extending *Bivens*.  *See Hernandez*, 589 U.S. at 102 (internal quotation marks and alterations omitted) (quoting *Abbasi*, 582 U.S. at 136).  Although courts may consider various special factors, *see Bistrian*, 912 F.3d at 90, two "are 'particularly weighty': availability of an alternative remedial structure and separation-of-powers concerns," *see Mack*, 968 F.3d at 320 (quoting *Bistrian*, 912 F.3d at 90).

In *Egbert*, the Supreme Court reiterated its prior emphasis on the availability of alternative remedies, *see Egbert*, 596 U.S. at 497-98, further extending the Court's longstanding view that "when alternative methods of relief are available, a *Bivens* remedy usually is not," *see Abbasi*, (citing *Bush v. Lucas*, 462 U.S. 367, 386–88 (1983); *Schweiker v. Chilicky*, 487 U.S. 412, 425–26 (1988); *Corr. Servs.*

*Corp. v. Malesko*, 534 U.S. 61, 73–74 (2001); *Minneci v. Pollard*, 565 U.S. 118, 125–26 (2012)).  The Bureau of Prisons ("BOP") has an alternative remedial structure in place with its administrative remedy program.  *See Malesko*, 534 U.S. at 68 (holding that "administrative review mechanisms" can provide "meaningful redress"—even if they do not "fully remedy the constitutional violation").  And *Egbert* makes clear that the question for this court is not whether a *Bivens* damages remedy would be more effective, nor even whether the existing remedy is sufficient.  "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy."  *Egbert*, 596 U.S. at 498.  The existence of the BOP's administrative remedy process "independently foreclose[s]" a *Bivens* remedy in this new context.  *Egbert*, 596 U.S. at 497.  Therefore, the Eighth Amendment claims will be dismissed.  Because a *Bivens* remedy is not available, the claims are dismissed with prejudice.

## CONCLUSION

For the above stated reasons, the court will dismiss the claims raised in the complaint with prejudice and close the case.  An appropriate order follows.

s/Jennifer P. Wilson  
JENNIFER P. WILSON  
United States District Judge  
Middle District of Pennsylvania

Dated: August 22, 2024